Dixon, Administrator, Respondent, vs. Sheridan, imp., Appellant.

*April 5—May 2, 1905.*

*Statute of frauds: Parol agreement to make a will: Parol transfer of personalty: Conversion: Double damages.*

1. In an action for conversion of certain personal property alleged to belong to a decedent's estate by transfer from his father, the evidence, stated in the opinion, is *held* to show a parol agreement by the father to make a will of real and personal property in favor of decedent, and such agreement, being indivisible, was void under the statute of frauds.

2. Under sec. 3824, Stats. 1898 (providing that if any person, *before the granting of letters testamentary or of administration*, shall convert any property of the deceased, such person shall be liable for double the value of the property so converted), a conversion, after the appointment of a special administrator but before the appointment of the regular administrator, is not within the terms of the statute.

APPEAL from a judgment of the circuit court for Juneau county: J. J. FRUIT, Circuit Judge. *Reversed.*

This is an action for the conversion of a quantity of grain and farm property of the alleged value of $554. The action was brought by the plaintiff as administrator of the estate of one William Sheridan, deceased, and it is alleged in the complaint that the property was converted after the death of said William Sheridan but prior to the appointment of the plaintiff as administrator; and judgment is demanded for double the value of the converted property, under the provisions of sec. 3824, Stats. 1898. The answer is in substance a general denial. The action was originally brought against Owen Sheridan, Sr., father of the deceased, and *Owen Sheridan, Jr.,* the appellant, a brother of the deceased, as joint defendants. It appeared on the trial that in 1896 the deceased, William Sheridan, being an adult, commenced to work his father's farm, and continued so to do until his death, May 1, 1901; that the father and mother lived upon the farm and the father did some work thereon, using the farm property and stock and participating in the management, the deceased, William, living with them in the father's house; that William married May 14, 1900, at which time he moved into a separate house, situated on the farm, with his wife, but still continued to work the farm. The plaintiff claims that all the personal property on the farm was transferred to William by his father at some time after 1896, but this is denied by the defendant. On the 6th of May, 1901, Owen Sheridan, Sr., deeded the farm to *Owen Sheridan, Jr.* May 23, 1901, P. A. Cleary was appointed special administrator of William's estate, and, upon his demand, about $400 worth of personal property was turned over to him. The plaintiff was appointed administrator July 13, 1901, and this action was thereafter brought to recover the value of the balance of the grain and property upon the farm. A general verdict was rendered in favor of the defendant Owen

Sheridan, Sr., but against the appellant, *Owen Sheridan, Jr.,* and assessing the plaintiff's damages at $1,150. Upon motion, the court set aside this verdict unless the plaintiff would remit therefrom $750, which remission being made, judgment was entered for $400, and *Owen Sheridan, Jr.,* appeals.

For the appellant there was a brief by *Veeder & Veeder,* and oral argument by *C. A. Veeder.*

For the respondent there was a brief by *Bowler & Bowler,* and oral argument by *J. J. Bowler.*

WINSLOW, J. The plaintiff's title to a considerable part of the property in dispute rests upon an oral transfer of the personal property claimed to have been made by the father, Owen Sheridan, Sr., to his son William, at some time after William returned home and commenced to work the farm. The only testimony tending in any way to support this supposed parol transfer was the testimony of Mr. Cleary, the special administrator, in whose office it appears the talk was had. That testimony is as follows:

"*Court:* You say you talked with the old gentleman previous to his son's death? *A.* Some time before that he was in my office with William, and we made up a list, and had an agreement existing between them. They entered into a will. *Q.* You mean the agreement independent of the will? *A.* Yes; it was talked over in the office. Mr. Smith drew up a *will in accordance with that agreement.* I do not know that the will is in existence. *Plaintiff's counsel:* I understand it has been destroyed since William's death. *Court:* He can state the contents. *A.* The understanding was that William was to take' the farm and work it and support the father and mother in the meantime, and at the death of the father—I don't know but the death of the father and mother—he was to become the sole owner of the farm upon his paying his sister, Bridget Sheridan, $1,000, and the will was drawn up in accordance to that. *Court:* What was the agreement in reference to the personal property, if any?

*A.* He simply was to take the place and run it; nothing said about personal property, but that he was to own all of it. He was to own everything. Everything was turned over to William at that time—real estate and personal property— upon condition he would support the father and mother, and own the real estate at their death, upon the performance of the $1,000 condition. Support them as long as they lived. They were to live with him. That agreement,—*those conditions were in the will.* (Objected to by defendant's counsel because it is proven that the agreement is in writing and the absence of the writing has not been accounted for.) *A. There was no contract.* The will was delivered to Owen Sheridan, Sr. I think it was made in duplicate. I think Mr. Smith kept a copy in his office. *Plaintiff's counsel:* The original, I understand, has been destroyed since the death of the young man. . . . *A.* I think I made a copy of the proposed will of Owen Sheridan, Sr., after William's death, and sent it to you [Mr. Bowler], and handed it to Mr. Jackson. I don't know that Mrs. Sheridan, the widow, also got a copy. I was familiar with the contents, which were as I have stated. The old gentleman said at the time, as I understand the agreement, that William was to have everything. I think there was nothing mentioned in the will as to personal property. I think the will was just in reference to real estate. *Q.* Did he say anything about William having all the personal property at that time? (Objected to for the reason that it has been shown that there was a writing which embodied the agreement made subsequent to the oral statement, and it is incompetent to prove the agreement by oral testimony.) *A. It was not mentioned in the will. But it was understood generally that the old gentleman turned everything over* to William, and that he was to get his support for himself and wife, *and at their death he was to own everything there,* except he was to give $1,000 to his sister. . . . I would not want to say that the instrument I have termed a will of Owen Sheridan, Sr., did not dispose of real and personal property, but my recollection is it didn't; that it only included real estate. (Instrument shown witness.) This paper is a copy of the will that was made. It does say, after paying the funeral expenses out of his personal property, the balance of personal estate goes to his son, William Sheridan. (*Plaintiff's coun-*

*sel:* I offer that instrument in evidence.    Marked 'Exhibit 6,' and received without objection.)    William Sheridan was present when this will was drawn and knew its contents.    It was a long time ago, and it is a matter I did not impress upon my memory; but it left the impression on my mind that William was to have the personal property at the time.    That is my best recollection—that William was to go in possession of the farm, and run it and own it, so to speak, upon the performance of its conditions, and he was to take the personal property and own that, and the old folks had nothing further to do with it, only to get their support out of the farm.    That is what I got from the conversation."

The copy of the will so identified by the witness devised and bequeathed all the real and personal property to William on condition of the payment by him of certain specific payments to the widow and other heirs.    It is very plain to our minds from this testimony that the arrangement made was simply an arrangement that the old gentleman should make a will of the real and personal property in favor of William. No other inference can, in our judgment, be reasonably drawn from the evidence.    A finding that there was any separate parol agreement presently transferring the personal property to William has no foundation to stand upon.    This being the case, the agreement was void under the rule laid down in *Ellis v. Cary*, 74 Wis. 176, 42 N. W. 252; *Kessler's Estate*, 87 Wis. 660, 59 N. W. 129; and *Martin v. Martin's Estate*, 108 Wis. 284, 84 N. W. 439, because it was an oral contract to devise real property as well as personal property, and, being indivisible, was contrary to the statute of frauds. The case was submitted to the jury under instructions which allowed the jury to find that there was a parol agreement transferring the title of the personal property on the farm to William, independent of the agreement to will the real estate; and, as we are convinced that the evidence does not tend to prove any such agreement, the giving of these instructions was fatal error.

Dixon v. Sheridan, 125 Wis. 60.

The trial judge further charged the jury that, if any of the property was converted before the issuance of letters of administration to *Mr. Dixon,* they should assess double the value of such property as damages, under sec. 3824, Stats. 1898. This section provides that if any person, *before the granting of letters testamentary or of administration,* shall convert any property of the deceased, such person shall be liable for double the value of the property so converted; and the question is whether a conversion after the appointment of the special administrator, Cleary, and prior to the appointment of the regular administrator, *Dixon,* is a conversion *before the granting of letters of administration,* within the meaning of the statute. We are referred to no authority upon this question nor have we found any. The statute must be strictly construed, because it is penal in its nature, and it was evidently intended to prevent the spoliation of estates at a time when there is no legal representative of the estate with power to take and preserve the property. A special administrator has such power for the time being as fully as a regularly appointed administrator; hence the evil or danger to be corrected by the statute did not exist during the term of the special administrator. We are inclined, therefore, to hold that a conversion during the time of the special administration is not within the terms of the statute.

Certain of the property was claimed to have been purchased by William from his own money, and the question as to the title of this property is not affected by what has been said as to the alleged agreement of transfer of personal property by the father to William.

*By the Court.*—Judgment reversed and action remanded for a new trial.